**Ted JOSEY, Appellant,**

v.

**JOHN R. HOLLINGSWORTH CORPORATION,**
**Appellee.**

**No. 92–1341.**

United States Court of Appeals,
Third Circuit.

Argued Jan. 4, 1993.

Decided June 21, 1993.

Kingsley A. Jarvis (argued), Norristown, PA, for appellant.

Paul R. Lewis (argued) and Jonathan D. Levitan, Kleinbard, Bell & Brecker, Philadelphia, PA, for appellee.

Before: MANSMANN and NYGAARD, Circuit Judges and RODRIGUEZ, District Judge.*

## OPINION OF THE COURT

RODRIGUEZ, District Judge.

Ted Josey filed this suit against his former employer, the John R. Hollingsworth Corporation, alleging he was discharged because of his race in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e–2(a). Josey is appealing an order of the district court granting summary judgment for Hollingsworth.

### I.

Josey, who is African American, began working for Hollingsworth in 1976. He was promoted to supervisor of the company's second shift in 1978 because of his reputation as an eager and intelligent employee, and remained in that position until elevated to Assistant Manager of Quality Assurance in 1987.

Hollingsworth, which produces electrical equipment for the military, started as a family-owned business. In 1982, the Hollingsworth family selected 13 "key and trusted" employees, all caucasian, and sold them the company. Josey was not offered the opportunity to buy shares at that time, nor were twelve caucasian employees who had been with the company longer than he. The company requires that shareholders wishing to dispose of their shares sell them back to the company. The shares are not resold once redeemed.

In December 1986, Josey became interested in replacing Robert Kirby, the Manager of Quality Assurance, who had made known his plans to retire. Kirby was one of the original 13 shareholders. Ray White, a shareholder and Vice President of Hollingsworth, promoted Josey to Assistant Manager of Quality Assurance in the spring of 1987. The vice president instructed Kirby to train Josey to succeed him in the manager's position. Josey alleges he was the only African American manager to work in an office position at Hollingsworth in its 30–year history.

Josey's promotion caused resentment among some of the company's managers and employees. Kirby appeared displeased with the move, and refused to train Josey. Les Horvath, a shareholder who had sought to replace Kirby, was also unhappy with the company's decision. The record indicates that Kirby thought Horvath should be his successor.

Josey believed that Kirby's ill will toward him was racially motivated. Before the promotion, Kirby remarked to him that one's job could not be significant if it could be filled by a black person. Once Josey was promoted, Kirby told employees that he had Josey cutting out paper dolls as part of his training. Vice President White, who acknowledged that Kirby would be a problem during the transition, imposed a training schedule on him. Kirby followed the schedule for only two weeks.

Hollingsworth employees indicated to Josey that they believed he was promoted only because he was African American. Josey received anonymous notes in his office which said, "Nigger get out," and "Can't you read nigger?" In February 1988, Vice President White terminated a manager suspected of leaving the notes, but cited economic concerns as the basis for the dismissal.

That month, Josey, frustrated with the treatment he was receiving, requested an unpaid leave of absence until Kirby retired. Kirby originally planned to retire in March 1988. Vice President White denied Josey's request. Josey asserts that in March or April 1988, the company's board of directors adopted a policy of giving job preferences to shareholder employees when layoffs occur.

---

* Honorable Joseph H. Rodriguez, United States District Judge for the District of New Jersey, sitting by designation.

The company has neither indicated the date it adopted this policy, nor refuted Josey's contention that it was in March or April 1988. The record indicates that only seven of the original 13 shareholders still held shares in 1988—three of whom were Kirby, Horvath, and Vice President White.

In May 1988, Kirby announced he was postponing his retirement indefinitely. That month, Vice President White discharged Josey citing economic concerns, and stating there was no need to retain Josey since Kirby was staying indefinitely. He claimed there was no other position in which the company could use Josey at the salary it was paying him. Josey found other employment after Hollingsworth terminated him.

When Josey was dismissed, he learned that the company planned to replace him as Assistant Manager of Quality Assurance with Horvath, despite the fact Horvath was paid a higher salary. Josey's successor as second shift supervisor, who had less experience than Josey, but is caucasian, remained with the company even after the elimination of the second shift.

In the summer of 1988, Kirby announced he would retire at the end of the year. In August 1988, the company designated Horvath, whose engineering position was being eliminated, as Kirby's replacement. Kirby retired on December 31, 1988, and Horvath took his position. Horvath retired in early 1991.

At one time, Hollingsworth employed as many as 450 people, but by 1988 had reduced its work force to approximately 175 employees. The company hired new employees after Josey's dismissal, but did not recall Josey. The company maintains that Josey never contacted it about employment after his termination. Hollingsworth states that its policy is to hire only unemployed people to fill open positions because the future of the company is uncertain.

## II.

Josey filed a charge with the Equal Employment Opportunity Commission (EEOC) which was dismissed on December 11, 1989. The EEOC denied the claim on review, and issued a right to sue letter on May 10, 1991. Josey filed this Title VII action on July 18, 1991.

The district court granted summary judgment for Hollingsworth on April 9, 1992. It found that Josey failed to meet his evidentiary burden once the company proffered a legitimate reason for his dismissal. The court analyzed several issues in the case and concluded that there were no material questions of fact which should be resolved at trial.

First, the district court stated that it was undisputed that Vice President White was the sole decision-maker, and, relying heavily on Josey's deposition testimony, found that White acted without racial prejudice. It therefore determined that the company's explanation that it dismissed Josey for economic reasons was not merely pretextual.

Second, the court accepted Hollingsworth's explanation that it adopted its policy to retain shareholders to protect those with a direct financial interest in the company. It did not determine when the policy was adopted or who was responsible for its adoption. Third, the district court found that Kirby extended his retirement date indefinitely due to financial concerns caused by his wife's illness. Fourth, the court decided that the people who subjected Josey to racially derogatory remarks and notes were not involved in the decision to discharge him. The district court described Josey's criticism of the company's handling of the incidents as "nitpicking," and inconsistent with his testimony that he believed Vice President White was not motivated by racial prejudice.

Fifth, the court determined that White's handling of Kirby negated any inference of discrimination that arose from Kirby's behavior. The court found that White "continued to closely monitor the situation," but also acknowledged that White was unaware that Kirby abandoned the training schedule after two weeks. Finally, the district court rejected Josey's disparate impact claim because he raised it after the close of discovery. The court held that the new claim would prejudice Hollingsworth because it would have different burdens and defenses under a disparate impact theory.

Josey appealed the district court's summary judgment order. This court has jurisdiction under 42 U.S.C. § 2000e *et seq.* and 28 U.S.C. § 1291.

### III.

When reviewing a grant of summary judgment, this court will apply the same test the district court should have used. *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Entry of summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

■ Summary judgment is precluded if a disputed fact exists which might affect the outcome of the suit under the controlling substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The standard for summary judgment will be the same for cases where the judge sits as finder of fact. *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1219 n. 3 (3d Cir.1988), *cert. denied,* 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989).

■ The moving party has the initial burden of demonstrating that no genuine issue of material fact exists. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the moving party has satisfied this requirement, the burden shifts to the nonmoving party to present evidence that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553; Fed.R.Civ.P. 56(e). Any inference to be drawn from facts contained in depositions and exhibits must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962).

■ In deciding a motion for summary judgment, the judge's function is not to weigh the evidence and determine the truth of the matter, but rather to determine if there is a genuine issue for trial. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. The district court cannot decide issues of fact at the summary judgment stage. *White v. Westinghouse Elec. Co.,* 862 F.2d 56, 62 (3d Cir.1988).

### IV.

The United States Supreme Court has noted that in the workplace, the "broad overriding interest, shared by employer, employee and consumer, is efficient and trustworthy workmanship assured through fair and racially neutral employment and personnel decisions." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973). "In the implementation of such decisions, it is abundantly clear that Title VII tolerates no racial discrimination, subtle or otherwise." *Id.*

■ Title 42 U.S.C. § 2000e–2(a)(1) (1988) states:

It shall be an unlawful employment practice for an employer—to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

The court's factual inquiry in a Title VII case is whether the employer intentionally discriminated against the employee. *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983) (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981)). The ultimate burden of persuading the finder of fact that the employer intentionally discriminated remains with the plaintiff. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94.

■ The Supreme Court established a three-step process for the presentation of proofs and the allocation of burdens in *McDonnell Douglas* and *Burdine.* First, plaintiff must prove by a preponderance of

the evidence that a prima facie case of discrimination exists. Second, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824, *cited in Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94. Third, if defendant meets its burden, plaintiff must be given the opportunity to prove by a preponderance of the evidence that the legitimate reasons proffered by defendant were not its true reasons, but rather, a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825, *cited in Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94.

### A.

■ To make a prima facie showing, Josey must demonstrate that: (1) he belongs to a racial minority; (2) he was qualified for the position; (3) he was discharged; and (4) other employees not in a protected class were treated more favorably. *Jackson v. Univ. of Pittsburgh*, 826 F.2d 230, 233 (3d Cir.1987), *cert. denied*, 484 U.S. 1020, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988). There is no dispute that Josey belongs to a racial minority and was qualified for the position. Josey presented evidence that his replacements, both as second shift supervisor and as Kirby's successor, are caucasians whom the company treated more favorably. This is sufficient to make a prima facie showing of discrimination.

### B.

■ Josey's establishment of a prima facie case of discrimination creates a legally mandatory rebuttable presumption. *Burdine*, 450 U.S. at 254 n. 7, 101 S.Ct. at 1094 n. 7. Hollingsworth must "rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Id.* at 254, 101 S.Ct. at 1094. Placing the burden of production on the employer serves to rebut Josey's prima facie case and to "frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Id.* at 255–56, 101 S.Ct. at 1094–95.

■ The company has articulated a legitimate, nondiscriminatory reason for Josey's dismissal. It stated that Josey was discharged for economic reasons, and that it legitimately preferred Horvath over Josey, given its policy of preferring shareholders over non-shareholders when layoffs became necessary.

### C.

■ When the first two steps of the analysis are complete, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94 (citing *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825). The plaintiff may show pretext directly by persuading the court that a discriminatory reason more likely motivated the employer. The employee can also show pretext indirectly by demonstrating that the defendant's proffered explanation is unworthy of credence. *Chipollini*, 814 F.2d at 897 (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095).

■ The Supreme Court has acknowledged that "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes." *Aikens*, 460 U.S. at 716, 103 S.Ct. at 1482. Where direct "smoking gun" evidence of discrimination is unavailable, this court has found that the proper inquiry is "whether evidence of inconsistencies and implausibilities in the employer's proffered reasons for discharge reasonably *could* support an inference that the employer did not act for non-discriminatory reasons, not whether the evidence *necessarily* leads to [the] conclusion that the employer did act for discriminatory reasons." *Chipollini*, 814 F.2d at 900 (citing *Graham v. F.B. Leopold Co.*, 779 F.2d 170, 173 (3d Cir.1985)).

### V.

■ On different occasions, this court has found that factors such as the defendant's credibility, the timing of an employee's dismissal, and the employer's treatment of the

employee could raise an inference of pretext which would make summary judgment for the employer inappropriate.

In *Chipollini*, the employer's proffered reasons for dismissal were economic concerns and plaintiff's diminished effectiveness on the job. 814 F.2d at 895. Plaintiff challenged the defendant's explanation and alleged it was a pretext for age discrimination. The court found that circumstantial evidence cast doubt on the employer's proffered reasons and ruled that the pretext question would turn on defendant's credibility. The credibility determination could not be made in the context of a motion for summary judgment. 814 F.2d at 901.

The timing of an employee's dismissal may raise an inference that an employer's purported reasons for terminating him were pretextual. In *White v. Westinghouse Elec. Co.*, an age discrimination case, plaintiff was dismissed during a reduction in force when he was three months short of serving 30 years with the company, which would have entitled him to higher retirement benefits and the option to retire at a younger age. 862 F.2d 56, 58-59. The reasons the company cited for his dismissal were that his performance ratings were low and his position as an employee on special assignment made him expendable. *Id.* at 58. This court found that the circumstantial evidence of the timing of his discharge was sufficient to raise a genuine issue of material fact and preclude summary judgment for the defendant. *Id.* at 62.

The employer's treatment of the plaintiff may be relevant to a showing of pretext. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825. In *Weldon v. Kraft, Inc.*, an African American employee claimed he was treated unfairly and eventually terminated because of his race. 896 F.2d 793, 794 (3d Cir.1990). The employer stated that the plaintiff was dismissed for poor work performance, failure to provide adequate medical documentation explaining his absence from work, and failure to follow a company policy on return of unused advance money. *Id.* Plaintiff alleged he was assigned to a supervisor who had a history of problems with African American employees. He contended that he was required to submit medical records for absences and pay back travel advances in cash, while caucasian employees were not asked to do so. Finally, the plaintiff alleged that the employer terminated minority employees in disproportionate numbers. *Id.* at 794-96.

This court held that summary judgment for the employer was inappropriate. It found that a factfinder could credit plaintiff's testimony regarding the harshness of treatment he received and his view that African Americans were dismissed more readily than caucasian employees, and conclude the company's proffered reasons for firing plaintiff were pretextual. *Id.* at 799-800.

## VI.

The district court analyzed several issues in the case and concluded that no genuine questions of fact existed for trial. This court examines the factual issues discussed by the district court mindful that inferences drawn from facts in the record must be viewed in a light most favorable to Josey.

### A.

The district court found that Vice President White was the sole decision-maker and noted Josey's deposition testimony that he did not think White was motivated by racial prejudice. The court concluded that the company's motives could not be challenged if White acted without racial prejudice. The court did not explore the decision-making structure of the company.

Josey disputes that White had either full control over employment decisions or was responsible for the shareholder preference policy. Since Kirby and Horvath were both share-holders, they could have exercised influence over the dismissal process.

 The district court acknowledged that Hollingsworth had economic problems as a result of reduced military spending, and accepted the company's proffer that Josey's dismissal was part of an ongoing workforce reduction. A company's need to reduce its workforce, however, does not absolve it from an examination of its motives in dismissing a particular employee. A company violates Title VII if it dismisses one employee rather

than another, solely on the basis of race. The statute could never be enforced in difficult economic times if a financial explanation for termination created a veil of immunity behind which employers were free to discriminate. The district court is obligated to take a closer look.

■ An examination of the record reveals inconsistencies in Hollingsworth's explanation that economic concerns spurred Josey's dismissal. First, Josey was told the position as Kirby's successor was no longer necessary since Kirby would be staying indefinitely. Two or three months before he was discharged, Josey asked to take an unpaid leave of absence until Kirby retired. Although this would have alleviated the financial burden of retaining an assistant manager, the company denied the request.

Second, when Josey was dismissed, he learned that Horvath would be assuming his position despite White's statement that the job was no longer necessary. Third, the company paid Horvath a higher salary than Josey, making Horvath a more costly replacement. Finally, Josey's successor as supervisor of the second shift, who had less experience, but is caucasian, remained with the company even after the elimination of the second shift.

A factfinder *could* use these inconsistencies to find the company's stated reasons were pretextual, and render a verdict for Josey. As the court noted in *Chipollini*, the finding that the employer's explanation was pretextual need not be the necessary conclusion, but only a possible one.

### B.

The district court found that Hollingsworth's policy of preferring shareholders during layoffs was adopted to protect those with a financial interest in the company. The court did not make a finding as to when this policy was instituted. Josey, however, maintains that it was established a month or two before his dismissal, while he was embroiled in the dispute with Kirby over his promotion.

The origin of the shareholder preference policy is unclear. The record indicates that in 1988 there were only seven shareholders. It is undisputed that both Kirby and Horvath were shareholders and that Horvath received Josey's job because of his position as a shareholder. The record also indicates that Kirby was displeased with the prospect of Josey's serving as his replacement, and preferred Horvath for the job.

By 1988, Hollingsworth had reduced its work force to approximately 175 from a high of 450. Despite the large reduction in force, Josey's uncontested assertion is that the policy was not adopted until shortly before his dismissal. After a full presentation of testimony at trial, a factfinder could conclude that the company's explanation for the policy was pretextual.

The Supreme Court noted in *Aikens*, that there is seldom eyewitness testimony as to the employer's mental processes. 460 U.S. at 716, 103 S.Ct. at 1482. Josey should not have his claim dismissed because he was not behind the boardroom door to ascertain the factors involved in establishing the policy. The summary judgment standard requires that a factfinder resolve genuine issues of fact such as the origin of the shareholder preference policy before determining whether the company's explanation was pretextual.

### C.

The district court found that Kirby decided to extend his retirement date for personal financial reasons. In *White v. Westinghouse Elec. Co.*, this court noted that the timing of events surrounding an employee's dismissal may raise an inference of discrimination. 862 F.2d at 62.

According to Josey's uncontested allegation, the company adopted the policy of preferring shareholders in March or April 1988—in the midst of the conflict with Kirby. Horvath, whom Kirby preferred as his replacement, was a shareholder. In May 1988, Kirby announced his intention to stay indefinitely despite his earlier plan to retire at the end of March 1988. Josey was dismissed in May 1988, partly because Kirby would be staying indefinitely. Within a few months of Josey's termination, Kirby announced he

would retire at the end of the year and Horvath was named to replace him.

The district court did not appear to consider that there was evidence of Kirby's animosity toward Josey because of his race, that Kirby had been resisting Josey's serving as his replacement, and that Kirby believed that Horvath should succeed him. The court also did not appear to reflect on the fact that Kirby announced his retirement shortly after Josey was dismissed.

Kirby's decision to postpone his retirement spurred Josey's dismissal. The credibility of Kirby's explanation for his shifting retirement dates should be judged at trial, not in the context of a summary judgment motion. *Chipollini*, 814 F.2d at 901.

### D.

█ Although the district court found that the individuals responsible for the racially-charged remarks and notes to Josey were not involved in the decision to discharge him, it did not explore the decision-making structure of the company. The court's finding appears to ignore that Kirby was both a manager and shareholder. Horvath was also a shareholder. The record indicates that the person suspected of leaving the derogatory notes was a manager.

As the late Justice Thurgood Marshall noted in his concurring opinion in *Meritor Savings Bank v. Vison*, "[a]n employer can act only through individual supervisors and employees; discrimination is rarely carried out pursuant to a formal vote of a corporation's board of directors." 477 U.S. 57, 75, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986).

This court noted in *Weldon* that summary judgment is inappropriate where a factfinder could credit plaintiff's testimony regarding the harshness of treatment he received because of the color of his skin. 896 F.2d at 799–800. The plaintiff in *Weldon* presented evidence that the manager he was assigned to work under had a reputation for being unfair to black employees. *Id.* at 794–95.

There is evidence concerning Josey's treatment at the company from which one could infer a discriminatory motive for his firing. First, Kirby made remarks to Josey about being replaced by a black person. Second, Kirby refused to train Josey, and Vice President White acknowledged that Kirby would be a problem. Third, Kirby flaunted his refusal to train Josey in front of other employees.

The court may also consider as circumstantial evidence the atmosphere in which the company made its employment decisions. One could infer from employees' remarks and the racially derogatory notes Josey received that management permitted an atmosphere of racial prejudice to infect the workplace. Josey's allegation that he was the only African American manager to hold an office position at the company in 30 years could also support this claim. A factfinder could conclude from the evidence of Josey's treatment at the company, along with other circumstantial evidence, that defendant's purported reasons for dismissal were pretextual.

### E.

The district court determined that Vice President White's handling of Kirby removed any inference of discrimination from Kirby's behavior. The court relied on the facts that White monitored the situation closely and Josey did not lodge further complaints about Kirby. It is unclear, however, how White could have been monitoring the situation closely, and not know that Kirby abandoned the training schedule after two weeks. Josey's request for unpaid leave until Kirby retired could be seen as a sufficient signal that Kirby had not reformed. The conflict of fact as to whether White possessed or exercised sufficient control over his fellow shareholder should not be resolved at the summary judgment stage. A factfinder could conclude that White's handling of the situation did not negate any discriminatory inference as to the company's motives.

### F.

Finally, the court rejected Josey's disparate impact claim because he raised it after the close of discovery. The pretrial memorandum apparently alleged that the shareholder-preference policy had a disparate impact on African American employees because

they were not offered the opportunity to buy stock in 1982. The court held that the new allegations would prejudice Hollingsworth because it would have different burdens and defenses from those under the disparate treatment claim.

■ To establish a prima facie claim of disparate impact, Josey would have to identify a specific employment practice of the defendant and demonstrate that its application had a disparate impact on a protected class. *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 656–57, 109 S.Ct. 2115, 2124–25, 104 L.Ed.2d 733 (1989). Josey's complaint does not specify any employment practice that had a disparate impact.

■ Josey should have moved to amend his pleadings during discovery upon his determination that he had a disparate impact claim. Fed.R.Civ.P. 15(a) permits a party to amend his or her pleadings by leave of court or with consent of the adverse party. The rule states that leave will be freely given when justice requires.

The district court found that amendment of Josey's pleadings after the close of discovery would prejudice the defendant. This court will not weaken the district court's control over its own docket by requiring a relaxation of pleading requirements. On remand, the district court should proceed under the disparate treatment theory set forth by Josey in his pleadings.

### VII.

In the context of an appeal from summary judgment, this court must evaluate evidence in a light most favorable to Josey and draw inferences in his favor. This decision does not alter the ultimate burden of proof, which rests squarely on Josey. The district court acknowledged that Josey's burden of persuasion at trial will be substantial, but failed to give appropriate weight to the presumptions the nonmoving party receives in a summary judgment analysis.

The indirect evidence of discrimination presented by Josey is sufficient to allow his claim to survive summary judgment. The total circumstances surrounding his termination challenge the credibility of Hollingsworth's proffered reason for his dismissal. The credibility of the company's explanation must be explored at trial.

For the reasons stated above, the district court's order granting summary judgment for defendant Hollingsworth is reversed as to the disparate treatment claim. The district court's dismissal of the disparate impact claim is affirmed. The matter is remanded to the district court for proceedings consistent with this opinion.